Jesse L. ALLEN and Constance G. Allen, Plaintiffs,

v.

Lee A. GIFFORD and Charles R. Samuels, Defendants.

Civ. A. No. 497–71–N.

United States District Court, E. D. Virginia, Norfolk Division.

May 15, 1973.

See also, 4 Cir., 462 F.2d 615.

Stanley E. Sacks, Sacks, Sacks & Tavss, Norfolk, Va., for plaintiffs.

Norris E. Halpern, Norfolk, Va., for defendant Lee A. Gifford.

Gordon E. Campbell, Campbell, Lustig & Hancock, Norfolk, Va., for defendant Charles R. Samuels.

## OPINION AND ORDER

MacKENZIE, District Judge.

Charging discrimination and denial to them of their civil rights guaranteed under the Constitution and Statutory Laws of the United States (42 U.S.C. § 1982), plaintiffs here sue defendants for compensatory and punitive damages alleging that defendants refused to sell real property to plaintiffs because plaintiffs are Negroes.

---

## FINDINGS OF FACT

(1) Plaintiffs, Dr. Jesse L. Allen and Constance G. Allen, his wife, both members of the Negro race, in late September, 1969, sought to purchase Lot 9, Block N, Georgetown Colony, Chesapeake, Virginia, first from the defendant, Charles R. Samuels, and then the defendant, Lee A. Gifford.

(2) Gifford was the owner and developer of the subdivision of Georgetown Colony and the title to Lot 9, Block N, Georgetown Colony, was registered in his name on September 11, 1969. On that date, a house constructed on Lot 9, Block N, was shown to the plaintiffs by Charles L. DeJournette, a real estate agent. The house on the lot had been built thereon by the builder-contractor, Samuels, who held a written contract to purchase the lot from Gifford.

(3) In September, 1969, Allen and his wife, Constance, plaintiffs, then residents of Miami, Florida, were seeking to purchase a house in Norfolk or environs, Dr. Allen having accepted a position as Assistant Superintendent of Schools, Norfolk, Virginia.

Samuels, a defendant, was a home builder of many years' experience who had, on many occasions, including the case at bar, acquired the rights to lots from Gifford by contract. Samuels would build a house thereon for speculative resale and would settle with Gifford for the purchase price of the lot when he sold the house. In this specific case, Samuels had paid $100 down on Lot 9, Block N, the total purchase price of which was $4700 and consequently owed Gifford $4600. The contract between Samuels and Gifford was dated July 26, 1967; the house construction had begun about October, 1968; the house had been completed about June, 1969; and had been on the market for sale about three months at the time it was shown to Dr. and Mrs. Allen.

(4) This Samuels' house was offered for sale to the public via a "for sale" sign posted thereon naming Gregory Realty Company as Sales Agent. The price was $37,500. On September 12, 1969, Dr. and Mrs. Allen were shown the house by Charles L. DeJournette, an independent real estate agent, also a Negro. Because of Dr. Allen's new position as the Assistant Superintendent of Schools of Norfolk, he acknowledgedly wanted to live in an integrated neighborhood and was attracted to this house for that reason among others.

Dr. and Mrs. Allen signed and offered to Mr. Samuels a contract to purchase the house for the price asked, $37,500, but added two conditions thereto: (1) that the living and dining area be repainted, and, (2) after Dr. Allen and his wife had secured an acceptable loan commitment and if settlement was delayed, that Dr. Allen be permitted to live in the property on a rental basis until final settlement. In the fall of 1969 a close money market was causing a delay between the date of the loan commitment and the date of the availability of money to fund that commitment, usually 60 to 90 days.

Mr. Samuels was out of the city when this offer was transmitted to his office in writing on Friday, September 12, 1969, but, according to his own testimony, he returned to the city on Wednes-

day, September 17, 1969 and then rejected the contract because he objected to the two conditions, above, as proposed by Allen. Upon such advice, Dr. Allen immediately withdrew these two conditions and offered to purchase the house as offered publicly. This latter offer to Samuels, under date of September 17, apparently reached Samuels about September 20. Samuels then advised Dr. Allen that the offer was too late, that he had already agreed to sell the property to Gifford. He gave as the reason for sale to Gifford that he, Samuels, was in default to Gifford on the lot purchase price and feared the lot purchase contract would be declared in default and that he would lose his house.

(5) Allen and wife then offered the same purchase proposal to Gifford, dated September 17, 1969, but that offer was rejected by Gifford.

(6) Dr. Allen, his wife, and two children moved to Norfolk on September 29, 1969 to take up his new job as the Assistant Superintendent of Schools. Having been unable to conclude the purchase agreement with Gifford, he moved into the Executive Motor Inn on North Military Highway on September 29, 1969 and remained there for 110 days until he subsequently bought and moved into the same Georgetown Colony house on January 16, 1970.

(7) Following Samuels' and Gifford's refusal to sell to Allen, Allen solicited the aid of E. L. Lamberth, Superintendent of Schools of Norfolk, Vincent E. Thomas, Chairman of the School Board of Norfolk, and others. Whether these people interceded is not shown, but, in any event, the defendant, Gifford, shortly thereafter saw fit to visit Allen in the latter's office on October 8, 1969. Without any equivocation, this court credits Dr. Allen's summary of the conversations of that date and does not credit Gifford, whose testimony in court showed that he obviously was shielding himself in his remembrance of the events of that conference. Dr. Allen states that he was there told by Mr. Gif-

ford that the time was not right for Gifford to sell to Negroes in the new Georgetown Colony subdivision, that he would suffer great financial loss if he sold to Dr. Allen. Mr. Gifford, however, agreed that he would let Dr. Allen know something final within a week. Mr. Gifford agrees that he never thereafter made any effort to reach Dr. Allen in that week or thereafter. At that meeting, though it was none of his concern, Gifford further took it upon himself to advise Dr. Allen that Norfolk ordinances would require a school board employee to live in Norfolk City and that Allen should seek to purchase a residence in Norfolk. This was absolutely not a City requirement as to Dr. Allen. The proffered advice also serves, however, to point up Gifford's efforts to avoid Dr. Allen as a purchaser. At that conference Gifford also told Allen that if Allen would wait about 18 months that he would then be willing to sell Dr. Allen a Georgetown Colony house. Dr. Allen tried thereafter to reach Mr. Gifford on three different occasions to determine what Gifford's final answer was and although he left messages, his name and telephone numbers, Gifford never made an effort to contact him.

(8) Thereafter, on October 28, 1969, Dr. Allen discussed the matter with Mr. Ferry, FHA representative in Norfolk, suggesting to Ferry that Gifford's refusal to sell him property at Georgetown Colony was racially motivated. On November 13, 1969 Allen talked with Claude Hart, the FHA representative in Richmond, Virginia. On November 3, 1969, Dr. Allen filed a formal complaint with HUD charging housing discrimination on account of race.

(9) While Mr. Gifford agrees that he received inquiries and was visited by representatives from these official sources, he denies that they in any wise influenced his final decision to accept the Allens' offer to purchase the property on November 26, 1969. The contract of November 26, 1969 was the same offer that had been made to Gifford on September 17, 1969. The sale to Dr. Al-

len of Lot 9, Block N, was ultimately settled on January 16, 1970.

(10) The court finds without equivocation that the defendant, Lee A. Gifford, made the following statements on the dates indicated. The court is mindful that Gifford denies making such statements but the court without hesitation, discredits Mr. Gifford.

(a) On September 24, 1969 at Mr. Gifford's office in an interview with Charles L. DeJournette, Real Estate Agent, a Negro, and Ellis W. James, white, a member of the Norfolk Fair Housing Committee, Gifford stated to them that he could not accept the Allens' contract because he did not want Negroes in Georgetown Colony; that he would consider selling the Allens if they would wait 18 months until the majority of the lots in Georgetown Colony had been sold; and in response to the direct question as to whether he had any reason for not selling to Dr. Allen, Mr. Gifford stated that it would ruin his entire investment in Georgetown Colony to sell property there to a Negro at that time.

(b) On October 8, 1969, at Dr. Allen's office at the School Board, Gifford told Dr. Allen that the time was not right for him (Gifford) to sell to Dr. Allen because he was a Negro and it would mean financial ruin for Gifford for a Negro to move into Georgetown Colony at that time; that Dr. Allen ought to wait for 18 months. Gifford also said at that time that we would call Dr. Allen back in a week to let him know his final action, but failed to call. At that conference also, Gifford attempted to talk Dr. Allen out of the purchase on grounds that the City Ordinances of the City of Norfolk might require that an Assistant School Superintendent live in the City of Norfolk and not in the adjacent City of Chesapeake, where the Georgetown Colony was located.

(c) That on September 24, 1969 at Mr. Gifford's office he told Mr. DeJournette that after he had sold a certain number of houses, about 75% of them, in Georgetown Colony, he would then sell a house to anyone; that on September 24, 1969, at the Gifford office aforesaid, in response to the point blank question from Ellis James to Gifford, "Is the reason you are not accepting this contract because our client is a Negro?" Mr. Gifford said, "at this time, yes. I have my life earnings at stake, and I cannot risk all of this to sell one house."

(11) Defendant Samuels has claimed time and again that he sold the house he had constructed on Gifford's lot back to Gifford because, in his contract with Gifford, dated June 27, 1967, he had agreed to begin a house within five months of that date and to pay the total purchase price of $4700 for the lot within one year. The court assigns absolutely no credence to this assertion by Mr. Samuels. The evidence is that he did not even begin the house on Lot 9, Block N, until October, 1968, which was 15 months after his purchase agreement with Gifford and therefore three months after it was already in default. The house was not completed until May, 1969 at which time Samuels was nearly two years in default, if one assumes the literal terms of the contract. If Samuels had been in such mortal fear that his house would be taken from him by lot owner Gifford, when it had only been completed and on the market for a little over three months, he would certainly have not been so antagonistic in a $37,500 sale to repainting a living and dining area at a cost that could not have exceeded $100, nor opposed to further negotiating some rental arrangement in which he could have been absolutely protected. Samuels' testimony was hesitant, shaky, constantly at odds with his own statements, nervously tendered, and could hardly be assigned any credibility at all, which is about as kind as the court can be with his evidence.

(12) Nor does the court give any credence to Mr. Gifford's assertion that he exercised his right of reclaiming title because he was concerned about Samuels' financial condition. In this regard, the court heard the evidence that in all

of Gifford's real estate development career, stretching back to 1952, and involving thousands of lots, Mr. Gifford had asserted this right of default *on only two occasions as to lots upon which houses had been built,* and both had the effect of defeating sales to Negroes (Dr. Allen and a Mr. Hodges).

In dealings between Samuels and Gifford stretching back to 1965 and encompassing many lots, Mr. Gifford had never indicated any interest in exercising the default provision on any previous occasion.

(13) While the evidence to establish liability is clearly at hand, the matter of proof of what damages the Allens have suffered is not as apparent.

Certainly the medical and hospital expenses for Mrs. Allen's illness have been established. Anxiety, embarrassment and humiliation are proved. The additional living expense, however, outlined in plaintiffs' exhibit 6, in many instances lack that clarity of proof which the law demands. For instance, the entire motel bill covering 110 days is not recoverable because even had the September 17, 1969 contract been originally accepted, the closing date Dr. Allen offered was November 15, 1969. So also, the additional cost of food remains speculative. Further, a portion of the mortgage payments which Dr. Allen would have been responsible for had there been no delay in his purchase might be considered as an offset.

It is true that Dr. and Mrs. Allen ultimately secured the property, but that does not make the element of damage moot.

---

## CONCLUSIONS OF LAW

■ (1) Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L. Ed.2d 1189 (1968) has now decided that all racial discrimination, private as well as public, for the sale or rental of property, falls within the purview of 42 U.S. C. § 1982. Whatever reticence was suggested by Mr. Justice Stewart in *Jones,*

*supra,* as to there being no express provision in § 1982 authorizing assessment of damages, such doubt was dispelled in Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), in which the court held:

"We held in Jones v. Alfred H. Mayer Co. that although § 1982 is couched in declaratory terms and provides no explicit method of enforcement, a federal court has power to fashion an effective equitable remedy. 392 U.S., at 414, n. 13 [88 S.Ct., at 2189].

.   .   .   .   .   .

Finally, as to damages, Congress, by 28 U.S.C. § 1343(4), created federal jurisdiction for 'damages or * * * equitable or other relief under any Act of Congress providing for the protection of civil rights * * *.' We reserved in Jones v. Alfred H. Mayer Co., 392 U.S., at 414–415, n. 14 [88 S.Ct., at 2190], the question of what damages, if any, might be appropriately recovered for a violation of § 1982.

"We had a like problem in Bell v. Hood, 327 U.S. 678 [66 S.Ct. 773, 90 L.Ed. 939], where suit was brought against federal officers for alleged violations of the Fourth and Fifth Amendments. The federal statute did not in terms at least provide any remedy. We said:

" '[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' *Id.,* at 684 [66 S.Ct., at 777].

"The existence of a statutory right implies the existence of all necessary and appropriate remedies. [Citations omitted.]

" 'A disregard of the command of the statute is a wrongful act and where it

results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied * * *.'" (Pages 238–239, 90 S.Ct. page 405.)

(2) The duplicity of defendant Gifford in the matter is obvious. This court accepts as true the testimony of those who quoted Mr. Gifford as refusing to sell because the plaintiffs were Black and it discredits Gifford's own statements to the contrary. Mr. Gifford is clearly guilty of racial discrimination towards Dr. and Mrs. Allen.

(3) The discriminatory actions of Samuels, while less patent, are nonetheless proved beyond a preponderance of the evidence.

His attempt to claim the pain of a financial straightjacket binding him to do Gifford's will is a sham of the first order. No other contract had ever been defaulted. There was never any suggestion in this case that any default was imminent. No creditors' demands or mechanics' liens to indicate any financial strain have been exhibited to this court. No suggestion is offered of any requests for payment for the lot by Gifford. Specifically, we find that the claim of Samuels that he feared a default proclamation from Mr. Gifford was only a front pumped up in one short day, September 19. Lastly, this is evident by Gifford's own admission to Samuels' attorney's cross examination that indeed this transaction was not a default, but an out and out purchase by Gifford for the full $37,500 purchase price.

(4) As compensatory damages, the court finds that the plaintiffs are entitled to recover from both defendants compensatory damages in the amount of $3500. We further find that the actions of Gifford were aggravated, willful and with total disregard of the rights of the Allens; that he denied the purchase of this property to Dr. and Mrs. Allen because they were Negroes, knowing full well the requirements of law that he could not discriminate in the sale of houses. Under the circumstances, the court finds punitive damages against the defendant Gifford in the amount of $5000, in addition to the compensatory damages above awarded.

(5) The Clerk is directed to enter judgment in favor of Jesse L. Allen and Constance G. Allen against Lee A. Gifford and Charles R. Samuels for compensatory damages in the amount of $3500, with interest from date, and costs. And the Clerk is further directed to enter judgment in favor of Jesse L. Allen and Constance G. Allen against the defendant, Lee A. Gifford, for punitive damages in the amount of $5000, with interest from date.